EVA GOLDSTEIN

*v.*

HYMAN I. GOLDSTEIN et al.

[Argued March 12th, 1917. Decided June 18th, 1917.]

1. A Jewish betrothal agreement whereby the prospective husband obligates himself to care for the property brought him by the wife and pledges his own property as security for doing so, constitutes marriage articles, which give rise to an executory trust, and impose upon the trustee and the court the duty of carrying it into effect in accordance with the intent of the parties.

2. The nature of such an executory trust indicates that the settlement will provide not only for the husband and wife, but for children, and it is the duty of the court to work out the details of the scheme so as to do justice and carry out the intention of the parties.

On appeal from a decree advised by Vice-Chancellor Backes, whose opinion is reported in *86 N. J. Eq. 351.*

Mr. *Henry S. Alvord*, for the complainant-appellant.

Mr. *Albert S. Woodruff*, for the defendants-respondents.

The opinion of the court was delivered by

SWAYZE, J.

The bill is filed to establish a trust in the sum of $5,000, to charge it on lands of the defendants, and to secure the return of wearing apparel, jewelry and wedding presents brought by the complainant on her marriage to the defendant Hyman I. Goldstein. The important question is as to the title to the $5,000. The facts are as follows: Eva Lipitz, then under sixteen years of age, the complainant, entered into a written betrothal agreement with the defendant Hyman I. Goldstein on June 10th, 1914. The agreement was signed by both. It provided for a marriage with ceremony of canopy and sanctification according to the rite of Moses and Israel; that they should share in their possession, just portion and portion as is the universal custom. The bridegroom bound himself to give presents to the bride according to the custom; the bride obligated herself to bring in as dowry $5,000 and clothing, beddings and trousseau, according to the manner of the prosperous. At the time of the betrothal, the father of the complainant deposited $5,000 in bank and received therefor a certificate payable to Eva Lipitz and Dr. Hyman Goldstein ten days after legal marriage notice. This certificate was then delivered to Dr. Goldstein who satisfied himself by inquiry that it was good for the money. Subsequently, in September, the marriage took place with ceremony of canopy and sanctification. We are furnished with a translation of a Jewish marriage certificate, translated from the original Aramaic, which sets forth the obligations of the parties. This is only a blank form. Mrs. Goldstein testifies that her husband took the original certificate from her. He testifies that he understood it was a certificate certifying to the fact that they were man and wife and that he was to feed and support her. He does not deny that he took the certificate from her. It is not questioned that this form is followed in a case of ceremony under the canopy and with sanctification and is included as a part of the ceremony. Dr. Goldstein's father testifies that they positively do it in every Jewish marriage. The certificate states that the bride consented to become the bridegroom's wife and brought unto him the dowry given her by her family, consisting of gold and

of silver, of ornaments and of garments, of furniture and of bedding, which the bridegroom accepted and agreed to ,add thereto and give her an equal sum, declaring:

"I accept the responsibility to the integrity of this dowry and of my addition thereto, for myself and my heirs that will follow me, to compensate with the most valuable of my estate and possessions, which I do possess anywhere beneath the sky, that which I have bought already and that which I may buy hereafter whether of land or of goods and chattels, all of which I hereby pledge as security and hold them subject to the collection of the sum set forth in this certificate, to wit, the amount of this dowry and my addition thereto even pledge the very cloak I wear on my shoulders in payment during my lifetime and after my lifetime from this day forever."

The certificate of marriage goes on to state that the bridegroom took upon himself, in accordance with the certificate, the responsibility for the dowry and the addition thereto. The certificate is declared to be subject to strict enforcement as all certificates of dowry customary among the daughters of Israel. It closes with the declaration that—

"We have purchased the right of this man, namely the bridegroom, and have vested it in this worthy woman aforementioned * * * to all that is written and set forth in the foregoing by means of an article with which the right and title may be properly purchased."

Dr. Goldstein obtained his wife's endorsement of the certificate of deposit and drew the money, most of which, $4,000 or more, he has invested in a house in Camden in his own name. Some of it seems to have been used to buy presents for the complainant, and some invested in a house, the title to which is in the doctor's mother.

The rights of the parties obviously depend on the betrothal agreement, the certificate of deposit and the marriage certificate. Dr. Goldstein's testimony as to the conversation with his prospective father-in-law is unimportant, since the negotiations, to call them by their proper name, finally took form in written documents. We think it clear that there was no gift of the money to the defendant. The fact that the certificate of deposit was in the joint names of the prospective spouses is conclusive on that point. The betrothal agreement contemplated a subsequent marriage according to commonly-used Hebrew rites which

involve obligations on the part of the prospective husband to care for the property brought him by the wife, and to add thereto; the pledge by the marriage ceremony of his own property as security indicated that he was to have either complete or partial control of the property, and that the wife was to have some beneficial interest therein secured by his pledge. If we lay aside the terms, unusual to our ears, in which the documents are couched, we have what is familiar to English law under the name of marriage articles, and we have a case of the legal situation, which so often arises out of marriage articles, of an executory trust, where to use the language of a classic text-book, "the creator of the trust has merely denoted his ultimate object, imposing on the trustee or on the court the duty of effectuating it in the most convenient way." *Adams Eq.* *40, a statement commended by Pomeroy as "very accurate." *Pom. Eq. Jur.* § 1001:

"In the case of executory marriage articles," continues the author, "there is an indication furnished by the nature of the instrument, independently of an expressed intention leading to this construction of the trust; for it is assumed, in accordance with ordinary practice, and in the absence of reason to conclude the contrary, that the settlement contemplated by such articles is one which will not only provide for the husband and wife, but will also secure a provision for the children of the marriage. If therefore the articles, strictly interpreted, would have a different result they will be moulded in conformity with the presumed object."

Pomeroy says (section 1001) that where marriage articles or agreements to settle are general in their terms, a court of equity presumes that it was the intention of the parties to provide for the issue of the marriage and will therefore direct a settlement to be made which does provide for the children. The subject is discussed in *Lord Glenorchy* v. *Bosville, 1 Lead. Cas. Eq. 1,* and the notes thereto, but we need go no further than the opinion of Mr. Justice Depue, speaking for this court, in *Cushing* v. *Blake, 30 N. J. Eq. 689* (at *p. 701*), followed by us in *Pillot* v. *London, 46 N. J. Eq. 310.* In those cases, indeed, the trusts were definitely and perfectly expressed in the declaration; here they are left indefinite and uncertain. Indefinite and uncertain as the terms are, the intent is clear. It is to create a trust fund in consideration of the marriage and for the purposes thereof.

It is for the court to work out the scheme of the marriage settlement. The fact that cases of this kind are uncommon and unfamiliar to our courts arises out of our different social customs and usages, which are apt to treat gifts of this kind as made to the bride and take little thought in the case of small fortunes of the objects of the marriage and the possible claims of future children. Uncommon and unfamiliar as such marriage articles are there is no reason why they should not be enforced and carried out as marriage articles and executory trusts are enforced and carried out by the English law. Since we think the case is one of an executory trust, it is not important to determine the effect of the complainant's endorsement of the certificate of deposit. Her husband was also a trustee, and the fund in his hands alone would be charged with the same trust as in their joint hands. It may be well to add that even if the complainant had a title free from the trust to any part of the fund, it would be presumed to remain her property. *Black* v. *Black, 30 N. J. Eq. 215.* (The reversal of that decree (*31 N. J. Eq. 798*), although without opinion, can only be interpreted under the facts of the case as emphasizing the principle, which has since been followed in this court. *Cole* v. *Lee, 45 N. J. Eq. 779,* at *p. 785*).

If a proper settlement had been drawn to effectuate the intent of the marriage articles, it would have provided that the trustees should hold the estate during the continuance of the marriage. Such a clause was approved in *Harvard College* v. *Head, 111 Mass. 209,* and may prevent the injustice of allowing the spouse who is guilty of misconduct to profit by the settlement as the law in England permitted prior to legislation. *Evans* v. *Carrington, 2 De G. F. & J. 481; Fitzgerald* v. *Chapman, L. R. 1 Ch. Div. 563; 45 L. J. Ch. 23; Chase* v. *Phillips, 153 Mass. 17; 26 N. E. Rep. 136.* The case is like *New Jersey Title Guarantee and Trust Co.* v. *Parker, 85 N. J. Eq. 557.*

In case the marriage shall be dissolved, as seems not improbable, in view of what has happened, the scheme of the settlement should provide for that contingency. Where husband and wife had separated, Lord Romilly, M. R., in *Munt* v. *Glynes, 41 L. J. Ch. 639,* directed that the legacy be paid to the wife. Each case depends on its own circumstances, but there would be all the

greater reason for this direction where the fund came from the wife or on her behalf and a trust would result upon failure of the purpose of the marriage articles. Speaking, generally, the court of chancery will now be in a position to work out a scheme in the light of what has happened, which shall be calculated to do justice and effectuate the intention of the parties. Illustrations of the length to which the court may go in settling the scheme to effectuate the intention may be found in the cases cited in the notes to *Lord Glenorchy* v. *Bosville,* in the Leading Cases in Equity, and in *Taggart* v. *Taggart, 1 Sch. & Lef. 84; Young* v. *McIntosh, 13 Sim. 445; Cogen* v. *Duffield, 2 Ch. Div. 1044; 45 L. J. Ch. 307.* The report in *13 Sim.* gives a form of decree. Other precedents may be found in *Seton Dec. 1235.* The opinion of the vice-chancellor was adverse to the complainant, and the scheme of the settlement was a matter which, under his view, it was unnecessary to consider.

The claim of the complainant to personal chattels was only touched upon in the court below and not discussed in this court. The evidence is not detailed enough to enable us to express any opinion that would be helpful. If important, it can be dealt with by the court of chancery upon more complete evidence.

The complainant is entitled to a decree charging upon the land owned by Dr. Goldstein, the amount which he invested therein out of the $5,000; appointing a trustee and settling the terms of the trust or the destination of the fund if the trust must be considered at an end. As to the amount invested in property owned by defendant's mother, we find nothing in the testimony to charge her with notice of the trust. As to that and any other sum that he may have spent out of the trust fund, the decree can only be a personal decree against him. The existing decree must be reversed and the record remitted to the court of chancery for further proceedings in accordance with our opinion. The complainant is entitled to costs in both courts.

*For affirmance*—None.

*For reversal*—GARRISON, SWAYZE, TRENCHARD, BERGEN, MINTURN, KALISCH, BLACK, WHITE, HEPPENHEIMER, WILLIAMS, TAYLOR, GARDNER—12.